SCHOTT ET AL., APPELLANTS, *v.* BANK OF ELMORE CO., APPELLEE.

(Decided October 30, 1939.)

*Mr. Lionel Levy,* for appellants.

*Mr. George C. Bryce and Messrs. Graves & Duff,* for appellee.

LLOYD, J.   This is the second appeal of appellants to this court on questions of law. At the first trial of the action in the Court of Common Pleas a demurrer to the petition, filed by the appellee bank, was sustained on the theory that the petition of the appellants did not state a cause of action, and judgment thereon was entered dismissing the petition. On appeal to this court, that judgment was reversed and the cause remanded to the Court of Common Pleas for further proceedings according to law. *Schott* v. *Bank of Elmore Co.,* 62 Ohio App., 67, 22 N. E. (2d), 996.

A retrial was had, resulting again in a judgment for appellee entered on a directed verdict. From this judgment the Schotts now appeal to this court. So much of the statements and allegations of the petition

necessary to state the issues involved are given in the opinion of this court rendered on the first appeal, and no reason appears for further referring to them except to emphasize that the alleged cause of action is based on the factual statements in the petition that the Schotts retained and paid the appellee bank to represent, advise and counsel them in the sale of their farm to a Mr. Damschroder. The entire cause of action is founded on this often-repeated statement.

The petition stated a cause of action but the evidence before this court on the instant appeal fails to support it unless it is to be presumed that Carsten, the cashier, by his personal acts, could *ipso facto* bind the bank in the exercise of an *ultra vires* act. Neither the bank nor its cashier had any authority to act as an attorney at law for anybody. Furthermore we are unable to find a shred of evidence that the bank as such knew of or had any information as to Carsten's outside activities or knew that the Schotts were consulting him not only at the bank but at his home, or any evidence that he was authorized by those in control of the business of the bank to so act; and certainly none of these things will be presumed.

With this necessary element of proof missing, to discuss the other alleged errors would be superfluous. As this court views it, the trial court could not do otherwise than direct a verdict, and its judgment is therefore affirmed.

*Judgment affirmed.*

CARPENTER and OVERMYER, JJ., concur.

(Decided November 20, 1939.)

ON APPLICATION for rehearing.

LLOYD, J. An application for rehearing has been filed by appellants, wherein it is contended that the

October 30, 1939, decision of this court, evidenced by our written opinion of that date, is factually incorrect.

This court has therefore reexamined the record to determine whether appellants are correct in this assertion.

The land contract between the Schotts and Damschroder was executed on September 20, 1919. It provides that the deed is to be delivered on March 1, 1920. The stipulated purchase price of the farm to be so conveyed was $11,100, $100 of which was paid in cash, $2,000 by note due March 1, 1920, ''and $9,000 payable on or before ten years after March 1, 1920, * * * to be covered by a note to be given at the time said first party delivers a deed to said property,'' and this is the entire contract as to the method of paying or securing the purchase price.

Schott testified that he had a contract with a Mr. Soncrant to sell his farm and went to see Carsten, the cashier of the bank, to learn if there was any way he could get out of that contract so that he could sell his farm to Damschroder, who had talked with him about buying it. He later received a letter from Soncrant that he would release him from the contract for $200. This was paid to him, one-half by Schott and one-half by Damschroder, the additional $100 mentioned in the land contract being Damschroder's one-half thereof. They then went to Carsten's home and told him about it and ''he said he would meet us at the bank.'' Damschroder and Schott had theretofore agreed on the purchase price of the farm and the way the money was to be paid, and this information was given to Carsten, who prepared the contract while Schott and his wife went home to get their deed containing the description of the land. Schott said Carsten had prepared this deed to him about two years before, but Mrs. Schott said that in this he was mistaken.

There is no evidence that Carsten included in the

Damschroder deed anything that Damschroder and Schott had not theretofore agreed upon, nor is there any evidence that Carsten gave any advice or made any suggestion as to what its contents should be. The land contract was a printed form, on which was written the description of the farm, the way in which the purchase price was to be paid, and when the deed was to be given.

On March 1, 1920, Schott and wife executed and delivered to Damschroder a warranty deed for the farm, at which time all of the purchase price was paid except $9,000, for which an unsecured note was given in accordance with the terms of the contract. Both Schott and his wife testified that when the deed was given, Carsten told them Damschroder was a wealthy man and the giving of further security was not necessary. Damschroder at that time owned another 160-acre farm upon which there were no encumbrances and which Damschroder testified was worth $100 an acre, plus the value of the buildings thereon. Thereafter Damschroder, becoming financially embarrassed, gave three mortgages to the bank in 1924 and 1925 on his 160-acre farm, one for $9,500, "given to take up loans in the amount of $5,125 consisting of five notes, and the balance was paid over to Mr. Damschroder." The five notes were given to the bank on August 25, 1923; October 11, 1923; December 8, 1923; December 17, 1923, and December 22, 1923. The other two mortgages secured $4,500 (of which $2,050 represented current indebtedness, the balance being paid to Damschroder) and $1,800, of which $1,250 paid an existing indebtedness to the bank, the balance thereof being paid to Damschroder. All of these mortgage transactions occurred approximately four years after the execution of the deed. Schott had heard of the financial condition of Damschroder and shortly before the $9,000-note became due, went to Carsten at the bank, who told him nothing could be done until the note became

due. He then again saw Carsten on February 28, 1930, when $500 was paid on the principal and new notes were given aggregating $8,500, secured by mortgage dated February 28, 1930, on the 160-acre farm already mortgaged to the bank. The bank, by Carsten as cashier, endorsed the notes to the order of Schott without recourse. On the mortgage appears an assignment dated March 7, 1930, from the bank, by Carsten, cashier, to Schott. After filing the mortgage for record on March 3, 1930, and after its return to the bank, Schott, at Carsten's suggestion, procured a safety box in which the notes and mortgage were placed. In the mortgage deed is a warranty ''that the premises are free and clear from all encumbrances whatsoever'' and Schott testified that he did not know and had not been told of the prior mortgages to the bank and did not know about them until he went to the recorder's office at Fremont to record the assignment to him of the mortgage, when foreclosure proceedings had been commenced by the bank. Carsten prepared the Damschroder-Schott land contract, the deed, the mortgage and all of the notes. Carsten and a Mr. Nieman, who was cashier of The First National Bank, had made a business of preparing ''deeds and contracts and leases and things like that'' and were the only two people in Elmore who made a practice of doing that.

Mrs. Schott testified that her husband had engaged Soncrant to sell their farm for $12,000 and about a week later Damschroder came to their house about buying the farm. When told about the Soncrant contract, he said ''we would get him out of it by paying a small sum''; then Soncrant came out ''and wanted his agreement back and then we got a letter from Soncrant offering to settle for $200.'' Finally Damschroder offered to pay one-half of the $200 and Mr. Schott went to see Mr. Carsten at his home, showed him the letter from Soncrant and asked him:

''If he paid off Soncrant, how we could be sure that

Mr. Damschroder wouldn't back out. He said, he could and would take care of that by making a land contract for Mr. Damschroder to sign. We then met Mr. Damschroder uptown and showed him the Soncrant letter, and so finally we agreed we would do that and he took us up to Mr. Carsten's house to leave him know about it. Carsten said 'Go all up to the bank and I will meet you there,' and so we went; and when we all was there Mr. Carsten said, 'I will have to have your deed to get the description.' Carsten prepared the contract while we went after the deed.''

On March 1, 1920, Mrs. Schott and her husband met Damschroder uptown and they all went to the bank to see Carsten, and, ''I asked if we can't make it some different way,'' so that Mr. Schott would be paid more before the deed was given.

''Carsten says 'What does the contract say?' and went away and got the contract somewhere in the bank. Then he says, 'The contract says you have to give the deed and you have to take $2,000 in cash and a $9,000 note for ten years.' He said: 'You don't need to worry, Mr. Damschroder can't get out of it, they have to pay it. They own 160-acre farm and now when he gets this farm he will be worth just that much more. He will be all right. Your money isn't lost at all. Don't believe that your money is lost.' That is the way he kept saying every time when I was worried to death, and sent my husband up to him.''

The $2,000 was paid and the $9,000 note was given to them by Carsten. In September, before the note was due, having ''heard of Mr. Damschroder's trouble * * * we went to see Carsten about it, and he said; 'Well, give him longer time and he will pay you $500, and then we can make out new papers and then it will be all right and we can go on again.' '' The interest on the $9,000 was paid, sometimes at Schott's home, and sometimes at the bank, and when paid at the bank was credited to the Schott's deposit account.

On February 28th, Mr. and Mrs. Schott and Damschroder went to see Mr. Carsten at the bank and "we said we wanted a mortgage drawn" and Mr. Carsten said "all right." Mr. Damschroder said "he was going to pay $500 and the interest, and then wanted to make new papers out * * * mortgage and note" on his farm, and then "Mr. Carsten drawed the papers." Mr. Carsten gave them the mortgage and notes after the mortgage was recorded, and they gave him a dollar "to send for us to get the policy" of insurance on the buildings. There were two policies, "one for cyclone and one for fire." Carsten "sent us a letter and said we better take a safety deposit box to put our papers in, so that they would be safe * * *. I paid him for the safe deposit box and I left them there, my papers." They didn't know about the three preceding mortgages held by the bank before they went to Fremont to have the assignment thereon recorded and later when they were served with summons in the bank foreclosure suit.

When Mrs. Schott and her husband went home to get their deed for Mr. Carsten, they knew the sale price of the farm was to be $11,000; that $2,000 was to be paid down, and the balance was to be paid by a note; and that no one in the bank, so far as she knew, had anything to do "with any of these papers" except Mr. Carsten, and that Mr. Nieman, cashier of the other bank, drew the papers for them when they purchased the 60-acre farm sold to Damschroder.

Damschroder testified that on September 20, 1919, he "must have owed the bank a couple of thousand dollars, and always went there when I needed money. I bought cattle, often a lot of cattle, and when I borrowed, that was the bank I used * * *. I borrowed and then paid back," and was never required to give any security for the loans he made. There were no mortgages on his 160-acre farm when he purchased the Schott farm and it was worth $100 an acre, ex-

clusive of the buildings. Objection to certain questions asked of .Damschroder were sustained and offers of proof were made to the effect that if permitted to testify he would say: "I sold it to a man by the name of Rewaldt" for "$12,000" of which "$8,600" was cash and the balance "by note of $4,000, payable within one year," and that "I paid it into the Bank of Elmore and paid off some indebtedness in the amount of $3,000, which I owed."

Other than the deeds, mortgage, notes and insurance policies offered and received in evidence, the foregoing states the facts upon which the decision and opinion of the court of October 30th was based. We then found, as again we find, no facts in the record, directly or inferentially, to show that the bank had authorized Carsten to act for it in the transaction or that anyone having authority with respect to the conduct of its business had any knowledge or information as to Carsten's part therein. There is no evidence of collusion between the bank and Damschroder, or that Carsten had any ulterior motive in the advice he gave and in what he did. Including as evidence the offers to prove, there is no proof as to when Damschroder sold the Schott farm or that the bank or Carsten had anything to do with its sale, unless it can be inferred from the fact that he paid therefrom to the bank an indebtedness to it, according to Damschroder, of $3,000.

The wrong committed, if any there was, was in the terms and conditions of the land contract and the execution of the deed to Damschroder without some security, mortgage or otherwise, for the $9,000 note. There is no Ohio statute of which this court is aware that designates a cashier of a bank as one of its officers or that provides what his duties and authority shall be or that a bank shall have a cashier. He is an employee and his duties as such are necessarily those which the bank vests in him. In one bank his duties and authority may be limited; in another, they may

be all-inclusive. This court is not willing to say that a cashier, simply because he is a cashier, can bind the bank in matters not a part of the bank's business.

In the instant case there is neither proof of the power and authority vested in him, nor of any previous similar acts of Carsten that would imply knowledge on the part of the bank that he was playing adviser, counsellor and scrivener to the Schotts in the transaction in question—something which was none of the bank's business and with respect to which it had no duty and was not privileged to perform. No agent can bind the principal unless he acts within the scope of his authority, or the principal directly or by implication has acquiesced in the act of the agent.

The burden of proof was on the appellant to produce evidence that would warrant such finding. There is none such in the record, and the application for a rehearing is therefore denied.

*Rehearing denied.*

CARPENTER and OVERMYER, JJ., concur.